[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Everett A. Petronio, Sr. (hereafter "the Receiver") was appointed permanent Receiver of The Laser Institute of Medical Esthetics (hereafter "LIME" or "the Corporation") on May 19, 2003. Prior to the Receivership, the Corporation had been in possession of two medical laser machines used in the operation of its business of providing cosmetic laser treatments.[1] A dispute has arisen during the course of the Receivership relative to the Receiver's alleged rights with respect to this machinery as compared to the rights claimed by MKLK, Inc. d/b/a Automated Data Systems (hereafter "ADS"). The Receiver has made a recommendation to the Court relative to the disposition of the laser equipment. In his recommendation, the Receiver asserts that in the absence of an enforceable written lease or evidence of ADS being a secured creditor, ADS may only be characterized as an unsecured creditor, and ADS may not claim a right to repossess the equipment. According to the Receiver's recommendation, ADS is responsible for turning over the laser equipment to the Receiver as property of the Receivership estate, with ADS only having an unsecured claim in the Receivership.[2]
ADS, on the other hand, claims that it either leased the equipment in question to LIME, or alternatively, that the use of the property by LIME was in connection with a bailment. Accordingly, ADS asserts that title to the equipment never passed to LIME, that ADS had the right to repossess the equipment once the Corporation ceased making payments to ADS, and that the Receiver's recommendation that the equipment is owned by the Receiver as successor in interest to the Corporation is misconceived.
Certain facts essential to this dispute were set forth in a "Stipulation of Facts" which was introduced at the hearing as Exhibit A. In addition, the Court held an evidentiary hearing in connection with the Receiver's recommendation, at which hearing the Court heard testimony from Jeff Cataldo, a principal of ADS, and from Ms. Mack, the former President of LIME. At the hearing the Court also received documentary evidence. Based upon the parties' stipulation, as well as the evidence presented at hearing, the Court makes the following findings of fact in evaluating the Receiver's recommendation:
 1. On or about June 3, 1999, Ms. Mack, Jeff Cataldo and Norma Cataldo incorporated LIME, a Rhode Island corporation with its principal place of business in Providence. The Corporation was formed for the purpose of providing cosmetic laser treatments to patients.
 2. Mack owned 50% of the issued and outstanding stock of LIME, Jeff Cataldo owned 25%, and Norma Cataldo owned 25%. Mack, as a 50% shareholder, and the Cataldos, representing the other 50% interests, each contributed equally to the capitalization of the Corporation.
 3. Mack, a registered nurse, had the responsibility of running the day-to-day operations of the Corporation, and actually provided the laser treatments to the patients. The Cataldos contributed business management expertise, operating and marketing support, both personally and through ADS, and provided the financial means and credit worthiness necessary to obtain the laser equipment needed for the operation of the business. ADS is a Massachusetts corporation, located in Stoneham, Massachusetts.
 4. Prior to and shortly after the creation of LIME, Mack and the Cataldos had discussions concerning the formation of the new business, and how the business would acquire the laser equipment for its operation. Several commercial leasing companies were contacted relative to the financial arrangements necessary to acquire the equipment. Because the standard commercial lease terms would require financial commitments greater than the new business could afford, discussions ensued between the Cataldos and Mack relative to alternatives to commercial leasing.
 5. Discussions focused on ADS purchasing the equipment and leasing it to LIME on terms more favorable initially than that which was available through commercial leasing sources.
 6. In furtherance of these arrangements, ADS purchased the two lasers. The Lightsheer Diode laser was purchased by ADS in late July 1999 at a cost of $92,800. The VPC laser was purchased by ADS in January 2000 at a cost of $171,200. The invoices and cancelled checks reflect payment by ADS, with the equipment shipped directly by the vendor to LIME in Providence.
 7. For a period from the date of purchase by ADS through July 2002,[3] LIME used the equipment in connection with its business operation with the permission of ADS. Initially, LIME made monthly payments to ADS of approximately $2,200. This amount was substantially less than the commercial lease payments that had been quoted to LIME during its initial investigation. Although in some months the payments were late, LIME generally was able to maintain its payments to ADS in a timely manner.
 8. Early in the year 2002, ADS was concerned that the reduced lease rate was insufficient to amortize the cost of the equipment over a reasonable period of time. ADS recomputed the payments based on a 60-month term and an interest rate of 5.75%. For the four month period from April through July 2002, LIME made monthly payments to ADS of $4957.93 based upon the recomputed schedule of payments.
 9. In the summer of 2002, Ms. Mack notified the Cataldos that she was withdrawing her services from LIME, and LIME thereafter ceased its business operations. In December 2002, ADS sent notice of default to LIME, and thereafter repossessed the equipment. ADS presently has custody of the equipment subject to the Receiver's claim that he is entitled to return of the lasers.
 10. There was never a written lease entered into between ADS and LIME. There is no promissory note, security agreement, or financing statement between ADS and LIME. There is no evidence before the Court that would justify a finding that the equipment represented a capital contribution by the Cataldos, or a gift. The equipment was never sold by ADS to LIME.
 11. As the Receiver concedes in his recommendation, the Cataldos were responsible for obtaining the lasers to be used by LIME, that the lasers were purchased specifically for LIME's use, that the lasers were in fact "given over" to LIME's care, custody and control, and that LIME was responsible for all costs associated with the care and maintenance of the lasers.
 12. In 2000 and 2001, ADS recorded the laser equipment as depreciable assets, and recorded the payments it received from LIME as rental income. On the corporate tax returns for LIME during the same period, which returns were prepared by the Cataldos using the same accountant as was used by ADS, the payments to ADS were recorded as rental expense.
 13. ADS filed a proof of claim with the Receiver for $242,938.57, representing the claimed unpaid balance of lease payments for the remainder of the alleged term of the lease.
 ANALYSIS
This Court at this time is not being asked to rule on the validity or amount of the claim filed by ADS. Likewise, this Court does not have before it issues concerning the rights or liabilities as among the shareholders of the Corporation, a matter which the Court understands is the subject of a separate lawsuit. See Mack v. Cataldo, C.A. PB 2002-4734. The sole issue which forms the basis of the Receiver's recommendation is whether the Receiver is the current owner of the laser equipment, or whether ADS remains the owner of the equipment, and therefore has the right to possession at this time.
This matter is before the Court upon a recommendation made to the Court by the Receiver. As Mr. Justice Silverstein recently observed, the Rhode Island Supreme Court has yet to articulate the standard of review that a court must apply when evaluating a receiver's recommendation. See HNYHolding Co., Inc. v. Danis Transportation Co., Inc., C.A. No. PB 02-6561, 2004 R.I. Super. LEXIS 161 (2004), at *12. Following persuasive authority from the federal courts, Mr. Justice Silverstein has ruled that in evaluating the Receiver's recommendations the court will review the Receiver's findings of fact for clear error, and his conclusions of law on a de novo basis. Id.
Although the Receiver in his recommendation did not make "findings of fact" denominated as such, the Court's findings of fact are in no way inconsistent with the facts upon which the Receiver has made his recommendation. Essentially, the Court, in its de novo review of the law, concludes that the relationship between ADS and LIME is one of bailor and bailee, and accordingly ADS retains title to the laser equipment and the right to its current possession.
A bailment has been defined under Rhode Island common law "as a delivery of personalty for some particular purpose, or on mere deposit, upon contract express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be." Don-Lin Jewelry Co., Inc. v. The WestinHotel Co., C.A. No. 96-1220, 2005 R.I. LEXIS 130, at *8 (R.I. 2005) (quoting Gallo v. American Egg Co., 76 R.I. 450, 72 A.2d 166 (1950);Emond v. Fallon, 56 R.I. 419, 425, 186 A. 15, 18 (1936)). Although a bailment is usually created by agreement of the parties, a bailment relationship may be implied by law whenever personal property of one person is acquired by another and held under circumstances in which the principles of justice require return to the owner. See generally 8A Am.Jur. 2d Bailments § 1.
It is questionable whether the lease introduced at the hearing as Exhibit G is in fact a written lease sufficient under the provisions of the UCC. See Gen. Laws 1956 § 6A-2.1-201(1).[4] The document dated May 16, 2000 does appear to include some characteristics indicative of an enforceable lease — a description of the lasers, the monthly rental fee, and an indefinite lease term. However, there is no evidence demonstrating that Jeff Cataldo, as secretary of MKLK, was authorized to sign the writing and bind LIME to the alleged lease agreement as is required by §6A-2.1-201(1). Jeff Cataldo's testimony was less than convincing relative to his authority to sign the lease as Secretary of LIME, when the President of LIME, Ms. Mack, testified credibly that she was not consulted concerning a written lease agreement.
The absence of a written lease is not determinative of the Receiver's position that title to the lasers passed to LIME upon their delivery. There is no question that with the tacit, if not express, agreement of Ms. Mack and LIME, ADS accommodated LIME as a start-up company by purchasing the equipment with its own resources and charging LIME a monthly amount significantly less than a market-rate equipment lease until the Corporation got "on its feet." The Court finds convincing and credible the testimony of Mr. Cataldo that there was an expectation that when the Corporation's profits grew, the below market-rate arrangement would be transformed to a market rate reflecting a reasonable amortization of the cost of the lasers. The Corporation received the equipment and used the equipment for nearly two years, initially paying a below market-rate monthly rental, and thereafter paying an amount reflecting an interest rate more closely matching a market rate. There is absolutely no evidence that LIME purchased the equipment from ADS on credit or otherwise, or entered into any secured financing arrangement with ADS.
The absence of a written lease enforceable under the UCC suggests to the Court that neither Ms. Mack nor the Cataldos were particularly careful concerning the documentation as it related to leasing the equipment. The Court, however, believes that it would be inequitable to penalize ADS for sloppy business practices on all sides of the transaction. It appears to the Court based on the credible testimony of Mr. Cataldo, that the Court should consider the equipment as delivered to LIME under an implied or constructive bailment, and, by virtue of this bailment, LIME had a duty to return the bailed property to ADS.
A constructive bailment arises when one person has lawfully acquired possession of another's personal property, other than by way of a bailment contract, and holds such property under circumstances that the law requires the recipient of the property to keep it safely and redeliver it to the owner. 8A Am. Jur. 2d Bailments § 12 (noting that a constructive bailment may arise when a party engages another to perform some service with respect to his or her personal property; however, does not provide the recipient of the property with any instructions as to its disposition); see also 8 C.J.S. Bailments § 15. As with an actual bailment, in order to have a constructive bailment, there must be evidence both that the property was delivered to the alleged bailee and that the recipient intended to exercise control over the property. 8A Am. Jur. 2d Bailments § 12.
In this case, even though there was no enforceable written lease, a constructive bailment relationship was formed between ADS, as the owners of the property, and LIME, as the possessor. LIME paid a monthly rental fee to ADS and assumed possession and control of the laser equipment by using it in the conduct of LIME's business. After the business of LIME terminated, ADS sent a repossession letter to LIME and subsequently reclaimed possession of the lasers by moving them out of LIME's business premises.
For the foregoing reasons, this Court disagrees with the Receiver's recommendation that ADS should turn over the lasers to the Receiver as property of the Receivership estate. An implied or constructive bailment relationship existed between ADS and LIME and, therefore, ADS retains title and the right to possession of the laser equipment.
The parties shall present to the Court an appropriate form of order consistent with this decision.
[1] The two pieces of equipment are known as a VPC Esthetic Laser and Lightsheer Diode Laser.
[2] Elaine Mack, the petitioner herein, (hereafter "Mack"), participated in the hearings, filed memoranda of law, and concurs in the Receiver's position that ADS has no right to reclaim the laser equipment.
[3] The testimony reveals that Ms. Mack, in late July or August 2002, withdrew her services from LIME. It appears, therefore, that from August 2002 until December 2002, the equipment remained at the LIME business premises, but that LIME essentially ceased operations at the time of Ms. Mack's withdrawal.
[4] Section 6A-2.1-201(1) reads in part:
(1) A lease contract is not enforceable by way of action or defense unless:
 (a) The total payments to be made under the lease contract, excluding payments for options to renew or buy, are less than $1,000; or
 (b) There is a writing, signed by the party against whom enforcement is sought or by that party's authorized agent, sufficient to indicate that a lease contract has been made between the parties and to describe the goods leased and the lease term.
(2) Any description of leased goods or of the lease term is sufficient and satisfies subsection (1)(b), whether or not it is specific, if it reasonably identifies what is described.